Cook *v*. Renick.

# ISAAC COOK, Appellant, *v*. ROBERT M. RENICK, Appellee.

## APPEAL FROM COOK.

Where a special term is ordered in court, the order of appointment need not be set out in the records, to show that such special term is regular.

The presumption of law is in favor of the regularity of the terms of court, but this may be rebutted, by affirmative proofs, or by showing that the judge was required by law to be elsewhere, holding another court.

A bill of exchange is properly protested for non-payment on the third day after that appointed for payment on its face. Days of grace are allowed and recognized.

The law merchant, included within the common law, is adopted in this State.

The service of notice of protest at the post office, the acceptor being postmaster, is sufficient, although not personally served.

PLACITA of the January special term (at which the judgment complained of was rendered), begun and held on the 11th January, 1858, " in pursuance of the order of this court, heretofore made and entered of record." But does not give the order nor state that any notices were given, or when the order in fact was entered.

This suit was commenced by summons, March 27, 1857,— Robert M. Renick, plaintiff, against Isaac Cook, defendant.

Declaration in assumpsit.

First count, on bill of exchange, dated St. Louis, Oct. 16, 1854, drawn by George Hulme on Hulme & White, for $2,000, to his own order, for value received. Bill accepted by Hulme & White, and indorsed by defendant to James T. Peters, and by him indorsed to the plaintiff. When the same became due, it was presented, payment demanded and refused, and defendant had notice, and bill protested for non-payment.

Second and third counts substantially the same. The common counts were added.

Plea, general issue.

Dec. 30, 1857, cause tried before MANNIERE, Judge, and a jury; there was a verdict for plaintiff for $2,363.33, and motion for new trial. Motion denied, and final judgment and appeal prayed.

On the trial, the plaintiff introduced and read to the jury a certain bill of exchange in the words and figures following:

*Accepted, Hulme & White.*

$2,000.                                          SAINT LOUIS, Oct. 16, 1854.

Sixty days after date, pay to the order of I. Cook, Two Thousand Dollars, and charge the same to account of

Yours,          GEO. HULME.

To Messrs. HULME & WHITE,

Young America, Chicago, Ill.

upon which is the following indorsement:

I. COOK.
JAS. Y. PETERS.
ROBERT M. RENICK.

And thereupon introduced as a witness *John Forsyth*, who, being sworn, testified: I protested the said draft on the 18th December, 1854. I left a notice of the protest at Cook's, the defendant's, office. I went to the office of the acceptors on that day, and demanded payment of a clerk there, and he said it could not be paid, and I gave notice to all parties. I may have left the notices that day or the next, not certain; but am certain it was done within forty-eight hours. I left the notice for Cook at the postmaster's room. Defendant was then postmaster. I don't know where he lived at the time.

Re-examined. The counsel for the plaintiff proposed to the witness the following question: Is there any universal, well-understood custom about days of grace among merchants and bankers in this city, in relation to the presentation of bills of exchange for payment? To which the defendant's counsel objected; the court overruled the objection, and the defendant excepted, and the witness answered: The custom is universal; been so, so far as I am aware—that is, to allow days of grace on all bills not payable at sight; on those on demand no days of grace are allowed; on sight drafts some allow and some do not. The custom on drafts not payable at sight is three days' grace. I have protested for a great many banks in this city, the Marine Bank, Burch's, Adsit's, Tinkham's, Swift's, and have had occasion to present notes and checks at almost every bank in the city. Have been a notary over five years. So far as I know, merchants have always claimed and recognized days of grace.

And here the plaintiff rested, which was all the testimony in the case.

And thereupon the defendant moved to exclude from the jury all the evidence given by the witness upon the subject of custom as to days of grace, which the court refused, and the defendant excepted.

The defendant then asked the court to instruct the jury as follows: That in this State there are no days of grace, and that in order to entitle the plaintiff to recover, he must show that the notice of protest for non-payment was given on the 16th, or at the farthest, on the 17th December, 1854; and that notice on the 18th December, 1854, is not sufficient in law; and that if they believe, from the evidence, that notice was not given until the 18th December, 1854, they will find for the defendant; which instruction the court refused to give, and the defendant excepted.

Errors assigned: First, That the term of the court at and

during which final judgment was rendered in said cause, does not appear by the record to have been held at the time, convened in the manner, and notice thereof given as required by law.

Second, That the court upon the trial of the cause, allowed improper evidence to be given to the jury.

Third, That the court allowed improper questions to be put to the witness, and answered by him upon the stand, before the jury.

Fourth, Because the court refused the instruction asked for by the defendant.

Fifth, Because the court refused the motion for a new trial.

W. T. BURGESS, for Appellant.

BECKWITH & MERRICK, for Appellee.

CATON, C. J. The placita in this record recites that the court was held " in pursuance of an order of this court heretofore made and entered of record." And it is objected that the order itself should be set out at length, else we must presume that no special term was properly called, and that there was no jurisdiction in the judge to hold the court, and that all the proceedings were *coram non judice*. We cannot concur in this view of the subject. The statute authorizes the appointment of special terms of the Circuit Court in two modes. In one case, the court, in term time, may enter an order upon its records, appointing a special term ; and in the other, the judge, in vacation, may make an order appointing a special term. In this last case, the judge is required to notify the sheriff of his order, when it becomes the duty of the sheriff to post notices thereof, and to summon juries ; while in the former case, no notice, or any other proceeding is required. In this case, the special term was appointed by an order of *the court*, and hence we see it was done in term time, and is the case first referred to. We do not think it necessary that the order of appointment should be set out in the record, for the purpose of showing that the court was authorized to act.

Where a proceeding appears to have been at a general or special term, the presumption of law is in favor of the regularity of said term, and of the jurisdiction of the court. This presumption may be rebutted, it is true, by showing affirmatively that there was no order of the judge or court appointing the special term, or where the court can see from the public law that the judge was required to be in another place, holding another court. Such were the cases of *Goodsell* v. *Campbell*, 1 Scam. R. 555, and *Archer* v. *Ross*, 2 Scam. R. 303.

The next question presented, is one of grave commercial importance. This bill was presented to the acceptors and protested for non-payment, and notice thereof left at the office of the indorser, on the third day after its maturity, according to the day of payment mentioned in the bill itself, and the evidence shows that such is the custom of merchants and bankers in Chicago, the place of payment, and the question is, whether under such circumstances, the demand and protest were in due time to fix the liability of the indorser. The history of the days of grace given on bills of exchange, first as a matter of favor, and then by custom claimed and sustained as a matter of right, is too familiar to the law student, to make it allowable for us to repeat it here. It is a part of the *lex mercatoria*, and the real question to be considered is, whether that is a part of the common law, and adopted with it, when the common law was adopted in this State. The law merchant first originated in custom among commercial men, who by common consent adopted such rules and regulations as they found the wants and necessities of commerce required; and as commerce was extended, it spread itself over the kingdom, till it became as universal as any principle of the common law. At first, the courts did not take judicial notice of it, but required proof to show what it was, when they would recognize and enforce it. Soon, however, it began to insinuate itself into the common law, by the courts taking judicial notice of it, till its fibres became so intimately interwoven with the body of the common law itself, that no one could draw the line of demarcation between the two; and the common law, ever improving and adapting itself to the requirements of commerce and the wants of the subject, finally, by progressive judicial decisions, the law merchant, or at least, that portion of it which was of universal application throughout the realm, was recognized by the courts without proof of its existence, and from that time forth, it became absorbed by and really constituted a part of the common law. The law merchant was originally distinguishable from the common law, in this, that the former was formed by the usage and recognition of commercial men, by slow and imperceptible degrees, while the latter was formed by the decision of the courts, taking notice of the wants, the necessities and the convenience of the subject, and recognizing and adopting the usage which such wants, necessities and convenience created. Were we able to explore the past with certainty, we should probably find that every essential principle of the common law, before it was first adopted by the decision of any court, could be found in some precedent custom, among the people, and which, by its convenience and justice, so commended itself to the courts, that they recog-

39

nized and adopted it as a part of the law of the land. We are, however, able to thus trace to its source, but little of the common law, except that which was adopted from the custom of merchants. That was so broad in its principles and so comprehensive in its objects, there was so much of it relating to one great subject, that it acquired a name to itself, and for dignity and importance struggled even with the great body of the common law, hence its name is remembered, while its separate existence has ceased to be. Were we now to strike from the common law all it has borrowed from, and which once constituted a distinctive portion of the law merchant, we should find it unfitted for the most rural districts of this country ; for agriculture has become so intimately connected and associated with commerce, that the rules which govern one must seriously affect the other. With all its avenues of intercommunication, commerce now extends itself to the granaries and pasture fields of the remotest frontiers. Thus dismembered, the common law would only be a fit code for the government of a fox-hunting gentry and their dependent serfs. While elementary writers and the judges of courts have been in the habit of speaking of the *lex mercatoria* distinctively, they have for a very long time spoken of it and treated it as a part of the common law.

The identical question which is presented in this case, was before the Supreme Court of Indiana in the case of *Piatt* v. *Eads*, 1 Blackford R. 81. The court there said, " The whole current of authorities, from the commencement of our system of jurisprudence down to the present day, goes to establish the doctrine that the custom of merchants is and always has been regarded as a part of the common law of England. It is a law of a general nature, and not local to that kingdom, and is there recognized by the courts as a part of their system, from the circumstance of its universal application and use in all commercial transactions throughout the commercial world." Again, that court says, " The *law merchant*, then, being a part of the common law of England, and being of a general nature, and not local to that kingdom, is comprehended in that clause of our statute which adopts the common law." Our legislature adopted the common law in the same terms in which it had been previously adopted in Indiana, and we agree with that court, that we adopted that portion of the common law which comprehends the law merchant, and that by the common law as thus adopted by us, a bill of exchange payable on a given day does not mature till three days after the day appointed on its face for its payment. We hold, then, that the bill in this case was presented to the acceptor for payment at the proper time, and was duly protested for non-payment. But in order to fix the liability of

the indorser, due notice to him of the non-payment must be given. As a general rule, by the common law, reasonable and prompt notice must be given to the indorser. Nor was this notice required to be in any particular form, or communicated by any particular person. It might be by the holder himself, or any other person, orally or in writing. But it must be with reasonable dispatch. And in order to fix what shall be considered a reasonable time, it is now settled, that where the indorser resides out of the place where the demand and protest are made, the notice shall be sent to him by mail, on the day of non-payment, or at farthest on the day following, or at least shall be left at the post office in time for such mail. In this case the indorser himself was the postmaster, and the notice was left at his room in the post office. This must be deemed as reasonable notice of the dishonor of the bill. But it is insisted that we have a statute regulating this subject, and which supersedes all other law. The statute referred to, is the sixth section of the seventy-fifth chapter Revised Statutes, and is this: " It shall be the duty of each and every notary public, personally to serve the notice upon the person or persons protested against, provided he or they reside in the town where such protest was made, or within one mile thereof; but if such person or persons reside more than one mile, then the said notice may be forwarded by mail, or other safe conveyance." Now, whatever may be said of the first member of this section, as being imperative that the notice must be served personally when it is served by a notary, and the party resides within one mile of the town, the latter part does not change the common law, or if it does, it relaxes it, for here it is said that the notice may be sent by any safe conveyance; whereas, decisions are not wanting to show that the notice must be sent by mail, unless the holder chooses to take the risk of the safe and speedy arrival of the notice. Here there is no evidence showing where the indorser did reside. The only witness of whom inquiry is made on the subject, was the notary who made the protest and gave the notice, who stated that he did not know where Mr. Cook resided. It is true, we are informed that he was at the time postmaster at Chicago, but it does not necessarily follow that he was a resident of that city, or that he resided within one mile of it. But he had a place of business in the post office, and we feel free to hold, that a notice addressed to him and delivered at his own post office, where his public duty required his daily attendance and supervision, was a reasonable and sufficient notice. Indeed no question seems to have been made on the trial about the sufficiency of the protest or notice, except as to time. The only question of law raised on the trial was upon this instruction:

"That in this State there are no days of grace, and that in order to entitle the plaintiff to recover, he must show that the notice of protest for non-payment was given on the 16th, or at the farthest, on the 17th December, 1854; and that notice on the 18th December, 1854, is not sufficient in law, and that if they believe, from the evidence, that notice was not given until the 18th December, 1854, they will find for the defendant." The reasons why we think this instruction was properly refused have already been given.

The judgment must be affirmed.

*Judgment affirmed.*